IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH DRUMM, | : | Case No. 4:15-CV-0854 |
| RONALD MCELWEE, | : | |
| CAROL BECK, | : | |
| LISA DELBAUGH, | : | |
| | : | Judge Brann |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| TRIANGLE TECH, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM OPINION

November 18, 2016

## I.      BACKGROUND

Plaintiffs, Joseph Drumm, Ronald McElwee, Carol Beck, and Lisa Delbaugh, hereinafter each referred to by their surname, are all former employees of Defendant, Triangle Tech Inc., hereinafter "Triangle Tech."  Defendant is a technical school with several locations throughout the Commonwealth.  Plaintiffs were employed by Triangle Tech at its Sunbury, Northumberland County, Pennsylvania location.

1

Plaintiffs filed their complaint on May 1, 2015, and a motion to dismiss was promptly filed.  In ruling on that motion, the Court directed Plaintiffs to file an amended complaint.  The amended complaint was filed on April 21, 2016 and is now the operative pleading in this action.[1]  Plaintiffs bring four counts against Defendant.  Count I is a retaliation claim under the federal False Claims Act; Count II is wrongful termination and retaliation claim under Pennsylvania's whistleblower law; Count III is wrongful termination in violation of Pennsylvania's public policy; Count IV is an alternative pleading by Plaintiff McElwee only, alleging termination in violation of the federal Family Medical Leave Act.

The subject of the instant Memorandum Opinion is a motion to dismiss the amended complaint.[2]  For the reasons that follow, the motion is granted in part and denied in part.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may file a motion to dismiss for "failure to state a claim upon which relief can be granted." Such a motion "tests the legal sufficiency of a pleading" and "streamlines litigation by

---

[1] ECF No. 19.
[2] ECF No. 20.

dispensing with needless discovery and factfinding."[3] "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[4] This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[5]

Beginning in 2007, the Supreme Court of the United States initiated what some scholars have termed the Roberts Court's "civil procedure revival" by significantly tightening the standard that district courts must apply to 12(b)(6) motions.[6] In two landmark decisions, *Bell Atlantic Corporation v. Twombly and Ashcroft v. Iqbal*, the Roberts Court "changed . . . the pleading landscape" by "signal[ing] to lower-court judges that the stricter approach some had been taking was appropriate under the Federal Rules."[7] More specifically, the Court in these two decisions "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard.[8]

Accordingly, after *Twombly* and *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

---

[3] *In re Hydrogen Peroxide Litigation*, 552 F.3d 305, 316 n.15 (3d Cir. 2008) (Scirica, C.J.) (*quoting Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 675 (7th Cir. 2001) (Easterbrook, J.)). *Neitzke v. Williams,* 490 U.S. 319, 326–27 (1989).

[4] *Neitzke*, 490 U.S. at 326 (*citing Hishon v. King & Spalding,* 467 U. S. 69, 73 (1984)).

[5] *Neitzke*, 490 U.S. at 327.

[6] Howard M. Wasserman, THE ROBERTS COURT AND THE CIVIL PROCEDURE REVIVAL, 31 Rev. Litig. 313 (2012).

[7] 550 U.S. 544 (2007); 556 U.S. 662, 678 (2009). Wasserman, *supra* at 319–20.

[8] *Iqbal*, 556 U.S. at 670 (*citing Conley v. Gibson*, 355 U.S. 41 (1957)) ("[a]cknowledging that *Twombly* retired the *Conley* no-set-of-facts test").

to relief that is plausible on its face.'"[9] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[10] "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[11] Moreover, "[a]sking for plausible grounds . . . calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[12]

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[13] No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[14]

When disposing of a motion to dismiss, a court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the

---

[9]  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

[10]  *Iqbal*, 556 U.S. at 678.

[11]  *Connelly v. Lane Const. Corp.*, No. 14-3792, 2016 WL 106159, at *3 (3d Cir. Jan. 11, 2016) (Jordan, J.) (internal quotations and citations omitted).

[12]  *Twombly*, 550 U.S. at 556.

[13]  *Iqbal*, 556 U.S. at 679.

[14]  *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 557 (internal quotations omitted)).

4

light most favorable to [the plaintiff]."[15] However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[16] "After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss."[17] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[18]

As a matter of procedure, the United States Court of Appeals for the Third Circuit has instructed that:

> Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[19]

The Court now turns to the specifics of the instant matter.

---

[15] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).
[16] *Iqbal*, 556 U.S. at 678 (internal citations omitted).
[17] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.).
[18] *Iqbal*, 556 U.S. at 678.
[19] *Connelly*, 2016 WL 106159, at *4 (internal quotations and citations omitted).

### III.   DISCUSSION

a.   FACTS

Taking the facts alleged in the amended complaint[20] as true, as I must when considering a motion to dismiss, the narrative that unfolds is as follows:

Triangle Tech is accredited by, and receives funding from, both the state and federal governments.  The events in question here are all alleged to have occurred at its school located in Sunbury, Pennsylvania.  Plaintiff Drumm had been employed as the school director.  Drumm was responsible for compliance with federal and state laws relating to, *inter alia,* accreditation and funding.  McElwee was the admissions representative; Beck was a career advisor; and Delbaugh was the academic affairs administrative assistant.  The Plaintiffs were subsequently terminated by Triangle Tech.

Plaintiffs aver that they are close friends, so close that they share life experiences together, such as inviting each other to weddings, children's birthday parties and graduation parties.  Plaintiffs often went to lunch together.  Delbaugh's daughter frequently babysat Drumm's children.    Drumm and Beck had known each other since 2005, when Beck was a student at the McCann School of Business, where Drumm was then employed.  Both Drumm and Delbaugh attended Beck's graduation from McCann School of Business.  Drumm later served as a

---

[20] ECF No. 19.

reference for Beck when she applied for the career advising position with Triangle Tech.  Plaintiffs allege that Defendant was aware of the Plaintiffs' "close personal relationships."

Other individuals who acted on behalf of Defendant are the president of Triangle Tech, Timothy McMahon, hereinafter "McMahon;" the director of financial aid, Catherine Waxter, hereinafter "Waxter;" and the director of career advising, Lisa Capuzzi, hereinafter "Capuzzi." Capuzzi was Beck's supervisor. Deborah Hepburn, hereinafter "Hepburn," was Drumm's "superior."

The amended complaint alleges that on June 5, 2014, Waxter contacted Drumm and asked him to back-date a document to permit a student to receive Title IV funds.   Title IV of the Higher Education Act of 1965 provides federal funds for financial assistance for students engaged in higher education.   The student had failed to meet satisfactory academic progress requirements,[21] and back-dating the document would allow disbursement of funds to Triangle Tech.

_____

[21] According to the amended complaint:
> Defendant is required to confirm a student is eligible to receive funds and making satisfactory academic progress.  The following must be confirmed: the student is enrolled in classes for the period; a student enrolled in a non-term program or nonstandard term program with terms that are not substantially equal in length has completed the previous period; if the disbursement occurs on or after the first day of classes, that the student has begun attendance; if the disbursement occurs on or after the first day of classes, that the student has begun attendance; for Direct Loans, the student is enrolled at least half-time; and first-time borrows [sic] have completed entrance counseling, received the required disclosures, and completed the first 30 days of their academic program.

Drumm believed this to be fraudulent and refused to sign the document that was to be submitted to the United States Department of Education, hereinafter "DOE."  Shortly after Drumm refused Waxter's request, he contacted both his own immediate supervisor and the vice president of human resources to advise both that Waxter had asked Drumm to back-date the document.  Eventually, someone at Triangle Tech back-dated and submitted the document for federal funds disbursement.  On June 18, 2014, the vice president of human resources contacted Drumm and advised that having conducted an internal investigation she had found no evidence of wrongdoing.

Despite the results of the internal investigation, Drumm nevertheless believed that back-dating the document was fraudulent.  On his own initiative he contacted the DOE and filed a complaint of wrongdoing by Triangle Tech. Drumm also filed a complaint with the Accrediting Commission of Career Schools and Colleges, hereinafter "ACCSC," and the United States Office of the Inspector General, hereinafter "OIG." On June 25, 2014, Drumm and McElwee met with an investigator from the OIG in what the amended complaint refers to as "the OIG meeting."   As part of the investigation, McElwee wrote a statement to the OIG and the DOE.  After the OIG meeting, Drumm told Delbaugh and Beck that he and McElwee had the meeting with the OIG.

Throughout July and August 2014, the DOE and OIG conducted an investigation of Triangle Tech, including interviewing employees and examining records; simultaneous with the investigation, Triangle Tech received re-accreditation.  Plaintiffs believe the retaliation toward them began during this time.

On August 11, 2014, Hepburn held a mandatory pre-accreditation meeting, at which all four Plaintiffs were present.  McMahon was also present, and told the staff that he was extremely disappointed that a complaint had been filed with the DOE.  Plaintiffs aver that, at this time, McMahon did not know which employee had filed the complaint.  Plaintiffs believed that McMahon was hostile and threatening toward the staff at this meeting.

The DOE then entered its investigatory findings on August 21, 2014.  It found that Triangle Tech did improperly receive approximately $70,000 in Title IV funds from October 2011 through February 2014.  Evidently, Triangle Tech agreed to return the funds, as the complaint further states that the DOE also found that any wrongdoing on the part of Triangle Tech was corrected upon the return of those monies.

Plaintiffs aver that around September 2014, Defendant became aware that it was Drumm who had filed the DOE complaint, and that he and McElwee attended the meeting with the OIG.  Plaintiffs further allege that "in or after September 2014, it is believed that Defendant learned of Delbaugh and Beck's knowledge of

9

the complaint." Plaintiffs also assert that, because of the foregoing, Defendant "began a concerted effort to investigate Plaintiffs' actions in the workplace with the intent of finding a basis for termination that would not appear retaliatory for the complaints to the DOE and the ACCSC."   This action on the part of Triangle Tech includes reviewing Plaintiffs' emails, time records, and "intimidating other employees to find perceived support for Plaintiffs' immediate termination."

McElwee's termination

McElwee was terminated on October 13, 2014 for "poor performance." Plaintiffs state that "McElwee's termination was less than four (4) months after he joined Drumm in reporting the facts surrounding fraudulent receipt of Title IV funds from the DOE, and approximately one month after Defendant learned who participated in the OIG investigation and who supported Drumm in the OIG complaint."   The amended complaint further avers that McElwee's termination was despite having received a "very positive annual review" in April 2014 and a 4% raise in May 2014.

Plaintiffs assert that despite improved performance from the prior year, McElwee was advised that "overall performance in admissions was not as good as expected."   He was "accused of dropping the ball a lot," being unprofessional, and spending "too much time out of the office." He was "belittled and blamed for not

10

establishing a relationship with the Veteran's Administration, despite the VA not having a designated representative to meet with McElwee."

Drumm's termination

Drumm was terminated on December 3, 2014 for "allegedly fostering an unprofessional culture in the workplace."  On November 20, 2014, he had been suspended without pay pending an investigation by Triangle Tech "into his alleged behavior in the workplace."  This was despite Drumm having received "exemplary performance appraisals" and "regular pay increases" for the prior nine years. Further, Plaintiffs allege that "prior to filing the complaints with DOE and ACCSC Drumm received a merit increase of 3.54 percent and Defendant advised his work was outstanding."

Despite these accolades, Drumm alleges that after the OIG meeting, he was "heavily scrutinized by Defendant."  Specifically, he asserts that Triangle Tech "deni[ed] an admissions representative to be present at the school at 7:30 a.m. on the first day of the fall 2014 semester, which was always previously permitted." He was also "advised by Defendant that he could no longer assist admissions representatives with their duties which was always previously admitted; prior to this time he was always praised for his willingness to assist in this area."  He also alleges that he was

> ostracized from school personnel, such as: no longer received
> assistance from corporate admissions personnel; all other school

11

directors (5 campuses) ceased communications with Drumm, despite their prior daily communications; Stephanie Craig, a school director, was advised by Hepburn to cease communications with Drumm; McMahon advised school directors to have no contact with Drumm; heavily scrutinized and required vigorous defenses to support salary reviews and performance appraisals of Drumm's direct reports.  Prior to the complaints, they were blindly approved.   This tsk was previously noted by Defendant as Drumm's management strength; Drumm's superior, Hepburn, began making unannounced visits to the school between September and November 2014 to intimidate and harass Drumm.  Prior to September 2014, Hepburn only made one unannounced visit to the campus during Dumm's nine years of employment; Hepburn began attending admission meetings at the Sunbury campus, yet she did not attend the admission meetings at the other five campuses.

Drumm perceived Hepburn's attendance at meetings as "intimidation to ensure information regarding the DOE investigation and complaint was not shared with the ACCSC."

Delbaugh's termination

Delbaugh was terminated on December 4, 2014 for "alleged bullying via email." "The emails referenced by Defendant were not created or sent by Delbaugh."  Plaintiffs aver in the amended complaint that McMahon told Karen Miccio (the complaint does not explain who she is) that Delbaugh was terminated to "get rid of the school clique," the "clique" meaning the four Plaintiffs.

Prior to her termination, Delbaugh was suspended without pay on November 20, 2014, the same day that Drumm was also suspended without pay, "pending an investigation into her behavior in the workplace."  "After Delbaugh's suspension,

instructors and students protested her firing and walked together in support of Delbaugh."

Delbaugh asserts that prior to her suspension she had "received exemplary evaluations," and that Hepburn had told Delbaugh that she was "the best at her job company wide." "After the complaints were filed, Delbaugh's duties were modified." "She was no longer responsible for training new academic advisors, as prior to the complaints."

Beck's termination

Beck was also terminated on December 4, 2014 for "alleged violations of wage and hour laws." Beck was also suspended without pay on November 20, 2014, the same day as Delbaugh's and Drumm's suspensions. Beck was suspended "pending an investigation related to modifications to her schedule, as approved by Drumm and her supervisor."

"Prior to this time, Beck received exemplary evaluations." "Beck's performance appraisal listed Attendance and Adherence to Policy as outstanding and exceptional, including statements such as attendance is a "definite strength," "always willing to adjust her work hours to meet the needs of employers and students," and "Beck followed all conduct rules and adhered to all company policies."

"In October 2014 and shortly after McElwee's termination, McMahon and Janis[, the vice president of human resources,] made an unannounced visit to the school at 6 p.m." "Beck was working at the time."  "When McMahon saw Beck working, he became visibly angry…" "McMahon never spoke to Beck regarding his concern."  "Beck's hours and schedule modifications were previously approved by Drumm and Capuzzi."  "Beck regularly worked evening hours due to the nature of her position and the need to contact students after their work day."  "This was approved by Drumm and her supervisors for many years."  "To meet the operational needs of Defendant, modifications to Beck's schedule were approved by Drumm on a day-to-day basis."  Plaintiffs assert that both Capuzzi and Hepburn were aware that the "operational needs of the school required Beck to work a modified schedule" and that the modified schedule was approved by both Capuzzi and Hepburn (in addition to Drumm's approval.  Plaintiffs assert that "Beck did not modify, edit or falsify her time records," and that "Beck did not receive wages for time not worked."

Now that the facts set forth by Plaintiffs have been recited, I turn to the merits of the motion.

b.   THE INDIVIDUAL DEFENDANTS ARE DISMISSED

The complaint[22] had named individual defendants in addition to Defendant

Triangle Tech.  The Plaintiffs' amended complaint names only Triangle Tech as a

defendant.  Correspondingly, I will dismiss the previously named individuals,

namely, Timothy McMahon, Catherine Waxter, Lisa Capuzzi, and Deborah

Hepburn, from this action.

c.   FALSE CLAIMS ACT

A direct violation of the False Claims Act, 31 U.S.C. § 3730, is brought as a

*qui tam* action.  However, individuals also may have a private cause of action

sounding in retaliation. Other courts have explained the private cause of action as

follows:

> [T]he Federal False Claims Act allows retaliation claims in
> connection with other provisions of the Act:
>
> > Any employee, contractor, or agent shall be entitled to all
> > relief necessary to make that employee, contractor, or
> > agent whole, if that employee, contractor, or agent is
> > discharged, demoted, suspended, threatened, harassed, or
> > in any other manner discriminated against in the terms
> > and conditions of employment because of lawful acts
> > done by the employee, contractor, agent or associated
> > others in furtherance of an action under this section or
> > other efforts to stop 1 or more violations of this
> > subchapter.

---

[22] ECF No. 1.

31 U.S.C. § 3730(h)(1). In other words, the False Claims Act creates a retaliation claim in circumstances where, in addition to satisfying other criteria, a person suffers retaliation as a result of "lawful acts ... in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." *Id.*[23]

"The FCA protects "whistleblowers" who pursue or investigate or otherwise contribute to a *qui tam* action, exposing fraud against the United States government."[24] "The legislative history…states that "protection should extend not only to actual *qui tam* litigants, but those who assist or testify for the litigant, as well as those who assist the Government in bringing a false claims action.""[25] "Noting that the actions expressly described as "protected activity" were not exclusive, this court held that 1) Plaintiff's showing of a newspaper article involving federal government fraud to her supervisors, and 2) bringing the alleged government fraud to the attention of her supervisors were within the meaning of "protected activity" under the FCA."[26]

The United States District Court for the Eastern District of Tennessee has explained retaliation in violation of the False Claims Act as follows:

---

[23] *Hicks v. D.C.*, No. CV 15-1828 (CKK), 2016 WL 1704119, at *2 (D.D.C. Apr. 28, 2016)
[24] *McKenzie v. BellSouth Telecommunications, Inc.,* 219 F.3d 508, 513 (6th Cir. 2000), see also 31 U.S.C. §§ 3729–3730.
[25] *Id.* at 514 (internal citation omitted).
[26] *Id.* (internal citation omitted).

To state a claim for retaliatory discharge under the FCA, a plaintiff must allege that: (1) he engaged in protected activity; (2) his employer knew he engaged in protected activity; and (3) his employer discharged or otherwise discriminated against him as a result of the protected activity. *McKenzie*, 219 F.3d at 514. In order to show he engaged in protected activity, a plaintiff must allege that he engaged in activities that either: (1) were in furtherance of a *qui tam* action under § 3730 of the FCA; or (2) were in effort to stop one or more violations of the FCA. 31 U.S.C. § 3730(h).

"In order to demonstrate retaliatory discharge based on the first type of protected activity, a plaintiff must allege that 'the defendant has been put on notice that the plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government.' " *Kem v. Bering Straits Info. Tech.*, No. 2:14-cv-263, 2014 WL 5448402, at *3 (S.D.Ohio Oct. 22, 2014) (*citing Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 567 (6th Cir.2003)) (other citations omitted). For the second type of protected activity, "an employee must be pursuing an effort to stop a specific violation (or potential violation) of the FCA of which he or she is aware." *Id. citing* 31 U.S.C. § 3730(h) and listing cases).

Here, plaintiff has not pled that he took any action in furtherance of a *qui tam* action or that he assisted in an FCA action brought by the government. Consequently, plaintiff has not pled the first type of protected activity under the FCA.

Plaintiff, therefore, must be relying on the second form of protected activity, that is, taking actions in effort to stop one or more violations of the FCA. To constitute an effort to stop a specific (or potential) violation of the FCA, an employee's conduct must be aimed at stopping specific fraudulent claims against the government. *See, e.g., McKenzie*, 219 F.3d at 516 (stating that to constitute protected activity, "the internal reports must allege fraud on the government"); *Watts v. Lyon Cty. Ambulance Serv.*, No. 5:12-CV-00060-TBR, 2013 WL 557274, at *9 (W.D. Ken. Feb. 12, 2013) (dismissing FCA whistleblower retaliation claim because the plaintiff did not plead "any fraud on the government").[27]

---

[27] *Verble v. Morgan Stanley Smith Barney, LLC*, 148 F. Supp. 3d 644, 657 (E.D. Tenn. 2015).

In the matter before this Court, it appears that the Plaintiffs are also relying on the second form of protected activity – taking actions to stop violations of the FCA.  As to Plaintiff Drumm, he has sufficiently stated a claim for retaliatory discharge under the FCA.  He is the individual who initially notified the DOE of the alleged violation and subsequently met with OIG investigators.  Similarly, Plaintiff McElwee has stated a claim for retaliatory discharge under the FCA.  He met with the OIG and then filed a statement with the OIG and DOE.

There are no averments that Plaintiffs Delbaugh and Beck were involved with protected conduct in attempting to prevent FCA violations.  Instead, Plaintiffs rely on a "zone of interest" theory.  The United States Supreme Court held in 2011 that a discharged employee could maintain a retaliation claim under Title VII for retaliatory discharge after his fiancé filed a gender discrimination complaint, as he fell within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.[28]

Plaintiff did not cite to any cases that extrapolated this holding to both close friendships and the FCA.  Plaintiff cited to one unpublished district court case that did apply the holding to a close friendship in a Title VII action.

---

[28] *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011).

*E.E.O.C. v. Fred Fuller Oil Co.*[29]   I am not convinced that the proper extension of

the law would be to apply the holding to the situation here, allegations of

termination in retaliation for a friend attempting to thwart a violation of the FCA.

Accordingly, this count is dismissed as to both Plaintiffs Delbaugh and Beck.

      d.  PENNSYLVANIA WHISTLEBLOWER ACT

Plaintiffs also assert that Defendant violated 34 C.F.R. 668.34(c)(4), which

states: "A student on financial aid probation for a payment period may not receive

title IV, HEA program funds for the subsequent payment period unless the student

makes satisfactory academic progress or the institution determines that the student

met the requirements specified by the institution in the academic plan for the

student."  Drumm asserts in the amended complaint that as school director, he was

"obligated to maintain the Defendant's compliance with all federal and state

regulations and ACCSC Standards of Accreditation."  He further alleges that

Waxter had asked him to commit fraud by back-dating the document, and he

would have been subject to a fine, imprisonment, or both.

Pennsylvania's Whistleblower Law provides that

(a) Persons not to be discharged.--No employer may discharge,
threaten or otherwise discriminate or retaliate against an employee
regarding the employee's compensation, terms, conditions, location or
privileges of employment because the employee or a person acting on
behalf of the employee makes a good faith report or is about to report,
verbally or in writing, to the employer or appropriate authority an

---

[29] No. 13-CV-295-PB, 2014 WL 347635, at *1 (D.N.H. Jan. 31, 2014)

instance of wrongdoing or waste by a public body or an instance of waste by any other employer[30] as defined in this act.[31]

A "good faith report" is defined as "A report of conduct defined in this act as wrongdoing or waste which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true. An employer is not barred from taking disciplinary action against the employee who completed the report if the employee's report was submitted in bad faith."[32]  "Wrongdoing" is defined as "A violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer."[33]

As set forth above, only Plaintiffs Drumm and McElwee have stated a claim that can survive a 12(b)(6) motion.  Drumm filed a complaint with the DOE and McElwee submitted a statement to both the OIG and DOE, in what may be determined to be good faith reports of wrongdoing.  Plaintiffs Delbaugh and Beck

---

[30] "Employer" is defined as "a public body or any of the following which receives money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body:(1) An individual.(2) A partnership.(3) An association.(4) A corporation for profit.(5) A corporation not for profit."  43 Pa. Stat. Ann. § 1422.  Although it is not clear to the Court from the papers if Triangle Tech constitutes a covered employer under the Act, it did not argue that it is not, accordingly, at this juncture, I must assume that it is a covered employer.
[31] 43 Pa. Stat. Ann. § 1423.
[32] 43 Pa. Stat. Ann. § 1422.
[33] *Id.*

have not stated a claim, as neither participated in making a good faith report of

wrongdoing or waste by Triangle Tech.  Accordingly, the motion to dismiss will be

granted as to these two Plaintiffs.

e.  WRONGFUL TERMINATION

i.  WRONGFUL TERMINATION AS AGAINST PUBLIC POLICY

"Generally, an employer may terminate an at-will employee for any reason,

with or without cause."[34]  "An exception to this rule exists where the termination

violates public policy."[35]  "To state a cause of action under the public policy

exception to the at-will employment doctrine, a plaintiff must point to a "clear

public policy articulated in the constitution, in legislation, an administrative

regulation, or a judicial decision.""[36]  "Pennsylvania courts have not explicitly

defined the boundaries of the public policy exception, however, its application has

been limited to situations in which an employer: (1) requires an employee to

commit a crime; (2) prevents an employee from complying with a statutorily

imposed duty; and (3) discharges an employee when specifically prohibited from

doing so by statute."[37]

[34] *Tanay v. Encore Healthcare, LLC*, 810 F. Supp. 2d 734, 737 (E.D. Pa. 2011) *citing Shick v. Shirey,* 552 Pa. 590, 716 A.2d 1231, 1233 (1998).
[35] *Id. citing McLaughlin v. Gastrointestinal Specialists, Inc*., 561 Pa. 307, 750 A.2d 283, 287 (2000).
[36] *Id. citing Hunger v. Grand Cent. Sanitation,* 447 Pa.Super. 575, 670 A.2d 173, 175 (1996).
[37] *Id.  See, e.g., Spierling v. First Am. Home Health Servs., Inc.,* 737 A.2d 1250, 1252 (Pa.Super.Ct.1999) (citations omitted); *Hennessy v. Santiago*, 708 A.2d 1269, 1273 (Pa.Super.Ct.1998) (citations omitted).

"The Supreme Court of Pennsylvania has emphasized that the public policy exception is not to be liberally construed."[38] "For example, Pennsylvania "will not recognize a wrongful discharge claim when an at-will employee's discharge is based on a disagreement with management about the legality of a proposed course of action unless the action the employer wants to take actually violates the law."[39] "Plaintiff in some way must allege that some public policy of *this Commonwealth* is implicated, undermined, or violated because of the employer's termination of the employee."[40]

Plaintiffs Beck and Delbaugh have not alleged a Pennsylvania policy that has been violated by their termination.  Accordingly, allegations of wrongful termination in violation of Pennsylvania's public policy claims will be dismissed.

In addition, Plaintiffs Drumm and McElwee here cannot 'double down' on causes of action.  "Courts have held that Pennsylvania's whistleblower statute has the same preemptive effect on the common law public policy residuum as other statutes, and have consequently  barred plaintiffs from pursuing the public policy exception when the whistleblower law affords a remedy.[41] Because Plaintiffs

---

[38] *Id. citing McLaughlin*, 750 A.2d at 287 ("An employee will be entitled to bring a cause of action for a termination of that relationship only in the most limited of circumstances where the termination implicates a clear mandate of public policy in this Commonwealth.").
[39] *Id. citing Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 328 (3d Cir.1993).
[40] *Tanay*  810 F. Supp. 2d at  740 (emphasis in original).
[41] *Kent v. Keystone Human Servs.*, 68 F. Supp. 3d 565, 568 (M.D. Pa. 2014) (Kane, J.), *See e.g., Katzenmoyer v. City of Reading, Pa.*, 158 F.Supp.2d 491, 503–04 (E.D.Pa.2001); *Freeman v. McKellar,* 795 F.Supp. 733, 742 (E.D.Pa.1992).

Drumm and McElwee have stated a claim under the whistleblower law, they

cannot make a public policy claim as well.

This claim will therefore be dismissed in its entirety, including its punitive

damages demand.

      f.  FAMILY MEDICAL LEAVE ACT

McElwee also pleads, in the alternative, that he was fired in violation of the

Family Medical Leave Act, hereinafter "FMLA."  McElwee originally requested

two weeks of family medical leave pursuant to the FMLA for the birth of his first

child, due on September 30, 2014.   His request for FMLA leave was approved on

September 26, 2014.  On September 29, 2014, McElwee's child "was born with

medical issues which arise to a "serious health conditions" under the FMLA."  On

September 30, 2014, McElwee "informed Drumm that as a result of his child's

medical condition, he would require additional intermittent leave."  "Drumm

informed [Terry] Kucic, [executive director of admissions, hereinafter "Kucic,"]

Hepburn, Janis, and Karen Kemmer, Associate Director of Admissions (Kemmer),

of the same."  That day, "Janis advised Drumm to complete a revised Notice of

Eligibility and Rights & Responsibilities (Family and Medical Leave Act) and

issue the same to McElwee, indicating McElwee would be required to provide

"sufficient certification to support his request for FMLA leave," and requesting

that a Certification of Health Care provider for Family Member's Serious Health

Condition (Family and Medical Leave Act) was to be submitted by October 13, 2014." Also that day, McElwee provided his child's birth certificate.

"On October 7, 2014, Kucic contacted Drumm and advised that she intended to terminate McElwee's employment on October 13, 2013, due to poor performance." "On October 8, 2014, McElwee submitted the requisite Certification of Health Care Provider for Family Member's Serious Health Conditions (Family and Medical Leave Act) to Defendant, reflecting two (2) weeks of consecutive leave and intermittent leave thereafter, following the birth of McElwee's child." McElwee asserts in the amended complaint that Defendant never approved or denied his request for intermittent leave for his child's serious health condition. On October 13, 2014, the day McElwee returned to work after the birth of his child, he was terminated. "Kucic advised McElwee that she was "advised to make changes to admissions" and "that he was terminated due to "poor performance."

Courts have explained the FMLA's protections as follows.

The FMLA provides job security and leave entitlements for employees who need to take absences from work for personal medical reasons, to care for their newborn babies, or to care for family members with serious illnesses. 29 U.S.C. § 2612. The FMLA entitles qualifying employees to take unpaid leave for up to 12 weeks each year provided they have worked for the covered employer for 12 months. 29 U.S.C. § 2612(a).

The FMLA creates two interrelated substantive rights for employees. *Xin Liu v. Amway Corp*., 347 F.3d 1125, 1132–33 (9th Cir.2003). First, an employee has the right to take up to twelve weeks of leave for the reasons described above. 29 U.S.C. § 2612(a). Second, an

24

employee who takes FMLA leave has the right to be restored to his or her original position or to a position equivalent in benefits, pay, and conditions of employment upon return from leave. 29 U.S.C. § 2614(a).

To protect the employee, the FMLA prohibits interference with the exercise of the employee's right to take leave. 29 U.S.C. § 2615(a). "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title." 29 U.S.C. § 2615(a)(1).

Congress has authorized the Department of Labor ("DOL") to issue implementing regulations for the FMLA. 29 U.S.C. § 2654. These regulations are entitled to deference under *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1123 n. 9 (9th Cir.2001). DOL regulations state that "[t]he FMLA prohibits interference with an employee's rights under the law." 29 C.F.R. § 825.220(a). Any violation of the FMLA itself or of the DOL regulations constitute interference with an employee's rights under the FMLA. 29 C.F.R. § 825.220(b). The DOL interprets "interference" to include "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *Id.* The regulations specify one form of employer interference: "employers cannot use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c).

Under the FMLA, 29 U.S.C. § 2601, et seq., the employee must establish: (1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled. *Sanders v. City of Newport*, 657 F.3d 772, 778, 08–35996, 2011 WL 905998, *5 (9th Cir. Mar. 17, 2011) (*citing Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir.2006)).[42]

---

[42] *Escriba v. Foster Poultry Farms*, 793 F. Supp. 2d 1147, 1158–59 (E.D. Cal. 2011).

I conclude that McElwee has sufficiently plead a claim under the FMLA. He has asserted that he was entitled to a second request for intermittent leave and was terminated the day he returned from his first request for leave and was about to begin the second leave request period.   The motion to dismiss McElwee's FMLA claim will consequently be denied.

## IV. CONCLUSION

For the foregoing reasons, the Motion to Dismiss under Rule 12(b)(6) will be granted in part and denied in part.  An appropriate Order follows.

BY THE COURT:

/s Matthew W. Brann
Matthew W. Brann
United States District Judge

26